# United States Court of Appeals for the Federal Circuit

---

**ENGAGE LEARNING, INC.,**
*Appellant,*

**v.**

**KEN SALAZAR, SECRETARY OF THE INTERIOR,**
*Appellee.*

---

2011-1007

---

Appeal from the Civilian Board of Contract Appeals in no. 1165, Administrative Judge Catherine B. Hyatt.

---

Decided: October 5, 2011

---

ELLIS B. FREATMAN, III, Roberts & Freatman, of Ypsilanti, Michigan, argued for appellant.

JANE W. VANNEMAN, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With her on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and BRIAN M. SIMKIN, Assistant Director. Of counsel on the brief were SARAH T. ZAFFINA and AARON S. LAX, United States Department of Interior, of Washington, DC.

---

Before RADER, *Chief Judge*, and LOURIE and O'MALLEY, *Circuit Judges*.

O'MALLEY, *Circuit Judge*.

Engage Learning, Inc. ("Engage") appeals from a decision of the Civilian Board of Contract Appeals ("the Board") dismissing its appeal for lack of subject matter jurisdiction. The Board held that it did not have jurisdiction under the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. § 601 *et seq.*, because Engage failed to establish that it had a contract with the government for the unpaid services. *Engage Learning, Inc. v. Dep't of the Interior*, CBCA 1165 (June 15, 2010) ("*Board Op.*"). Because we conclude that the Board erred in dismissing the appeal on jurisdictional grounds, but could have dismissed in part for failure to state a claim upon which relief can be granted, we affirm in part, vacate in part, and remand.

## BACKGROUND

Engage provides professional training, curriculum development, and technical assistance to schools, teachers, and administrators. Since 2001, Engage has provided these services to schools run by the Bureau of Indian Affairs ("BIA"), United States Department of the Interior, through the BIA's Family and Child Education ("FACE") program. The BIA funds services for its FACE program in two ways: (1) directly through BIA contracts, or purchase orders, with a service provider; and (2) indirectly through the distribution of funds under the No Child Left Behind Act of 2001 ("NCLB Act"), 20 U.S.C. § 6301 *et seq.*, to BIA schools, which in turn contract with a provider. Engage seeks payment from the BIA for services provided to BIA-operated schools during two time periods: (1) October 1 through November 22, 2002; and (2) March 1-4 and April 5-7, 2004. According to Engage, it rendered these services pursuant to an express or implied-in-fact

contract with the BIA. With respect to the services performed in 2004, Engage also alleges that those services were covered by a contract with the principal of a BIA-run school under the NCLB Act.

Regarding the 2002 time period, it is undisputed that in August 2002 the BIA awarded contract SMK0E020259 ("PO 20259") to Engage. Under the terms of this contract, Engage was to provide (1) a five-day teacher training on August 5-9, 2002; and (2) an unspecified number of site visits to thirty-two BIA schools between August 12, 2002, and June 30, 2003, to support implementation of the FACE program. The total contract was for $66,480: $30,480 for the teacher training and $36,000 for the site visits. Lana Shaughnessy, Special Assistant to Keith King, the Director of the Office of Indian Affairs ("OIA"), requested the services included in PO 20259 on June 17, 2002, via requisition K00E20-2-270. The requisition was also signed by Approval Official William Mehojah, Director of the Office of Indian Education Programs. The contract, dated August 8, 2002, was signed by Contracting Officer ("CO") Sonia Nelson.

PO 20259's contract price of $66,480 was significantly lower than what Engage originally proposed to the government. Earlier in the year, Engage had submitted a contract proposal to the BIA for services to be performed in 2002 and 2003 totaling $1,182,866, including $62,960 for two teacher trainings and $710,744 for four site visits to thirty-two BIA-operated schools. Two amendments were later made to requisition K00E20-2-27. The first amendment, dated August 28, 2002, includes an additional teacher training and additional site visits as well as two principal/administrator trainings and technology support, for a total cost of $796,304. The second amendment, dated October 8, 2002, includes additional site visits for $118,539. Both amendments were requested by

Shaughnessy and approved by Mehojah. No contracts signed by a CO accompany these requisition amendments. CO Nelson did sign one amendment to PO 20259 on December 18, 2002. This amendment, however, makes only an administrative change—a change to the accounting code—and specifically states that the "purchase order amount is not effective [sic] by this amendment." J.A. 95. There is only one other contract in the record from the 2002 time period: PO 20395, dated September 16, 2002, and signed by OIA Director and CO King. This contract authorizes $31,480 for a five-day teacher training. Later, in February 2003, King signed a contract with Engage for over a million dollars in services to be provided through December 31, 2003.

Overall, Engage claims to have provided $462,052.20 in services to BIA schools between September and December 2002, including the $66,480 paid by the BIA under PO 20259. Shaughnessey sent much of the rest of the remaining amount to the schools, which Engage then billed directly. At dispute is the partial nonpayment for services Engage provided to fourteen schools between October 1 and November 22, 2002. Engage submitted invoices for services totaling $118,054, of which the BIA refused payment on $80,485 contained in eight invoices. In May 2004, Engage again requested payment of the outstanding $80,485 from King.

On July 28, 2004, King denied payment. In his letter, addressed to Ms. Diana Johnston, President and CEO of Engage, King states his determination that the "invoices are in fact the result of an unauthorized commitment, made by a Government employee who did not have the authority to enter into an agreement on behalf of the Government." J.A. 101. King further states that he notified Shaughnessy and Johnston "prior to the work being performed which generated the above invoices, that

there was not a contract in place for these services and that, until a contract is in place, that these services should not be provided." J.A. 102. Shaughnessy disputes King's version of the facts. Specifically, she attests that, during this period, she "was the contracting officer representative" with "the authority to authorize and approve work performed by Engage Learning, Inc.," including "the authority to direct the schools to contract for these services and to bind the Government in that commitment." J.A. 898. Shaughnessy also attests that, during this period, "King's ability to perform his job was severely hampered by extensive absenteeism from work." *Id.* Engage's Vice President also contests King's account. According to Engage's Vice President, "Keith King gave verbal authority to conduct four site support visits each to thirty-two different Indian schools during the 2002 to 2003 school year."[1] J.A. 893.

The reference in King's letter to notifying Johnston is the subject of a memorandum from King to Shaughnessy dated October 4, 2002.[2] In the memorandum, King states that he and Johnston had talked that day about the absence of a contract for upcoming training sessions and site visits and that they had agreed that Engage would not perform any services until a contract was in place. Johnston denies that the October 4, 2002, conversation with King, now deceased, took place. Rather, Johnston claims that King did not instruct her to pause work until

---

[1]    At oral arguments, counsel for Engage indicated that this verbal authority related to approximately $35,000 worth of services. Oral Argument at 3:10-50, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/2010-1007/all.

[2]    This memorandum was not located in the contract file. Rather, counsel for the government discovered the memorandum in the files of the Office of the Inspector General ("OIG").

December 2002, causing the company to halt all work between December 30, 2002, and approximately February 14, 2003, when King signed a new contract.

In addition to the $80,485 in unpaid invoices from 2002, Engage also seeks payment for educational training and support services provided to the Cottonwood Day School in Chinle, Arizona, on March 1-4 and April 5-7, 2004. Engage provided these services at the request of the school's principal, Esther Frejo, via a 2004 FACE Site Visit Planning Form, on which Frejo checked the box indicating that she "would like to contract" for two site visits between January and May of 2004. J.A. 829. Following the site visits in March and April, Engage submitted invoices for $11,500 to the BIA. Engage alleges that it had a contract with the school's principal pursuant to the NCLB Act, under which the supervisor of a BIA-operated school can secure services without competitive bidding if:

> (i) the cost for any single item acquired does not exceed $15,000; (ii) the school board approves the acquisition; (iii) the supervisor certifies that the cost is fair and reasonable; (iv) the documents relating to the acquisition executed by the supervisor of the school or other school staff cite this paragraph as authority for the acquisition; and (v) the acquisition transaction is documented in a journal maintained at the school that clearly identifies when the transaction occurred, the item that was acquired and from whom, the price paid, the quantities acquired, and any other information the supervisor or the school board considers to be relevant.

25 U.S.C. § 2010(a)(3)(A).

On November 28, 2007, Engage submitted a claim under the CDA for $91,895 in unpaid services. The BIA, on March 5, 2008, relied on King's July 28, 2004, letter to deny Engage's claim. Engage filed a timely appeal with the Board in April 2008. At the Board, the government moved to dismiss Engage's complaint for lack of subject matter jurisdiction or for failure to state a claim under Board Rule 8(c)(1) or, alternatively, for summary relief (analogous to summary judgment) under Board Rule 8(c)(3).

On June 15, 2010, the Board granted the government's motion to dismiss for lack of subject matter jurisdiction, holding that it did not have jurisdiction under the CDA because Engage had failed to show that it had either an express or an implied-in-fact contract with the government. *Board Op.*, at 7. The Board first determined that there was no express contract for unpaid services at issue because PO 20259 was the only express contract during the 2002 time period and it did not include these services. *Id.* at 8. The Board rejected Engage's argument that the two amendments to K00E20-2-27 modified PO 20259 to include the additional work, concluding instead that the amendments did not rise to the level of an express contract because they appeared to be only requisitions and they were not signed by a CO. *Id.* at 9. The Board also noted that PO 20259 could not have been amended to add the additional services because the cost total would have exceeded the PO's $100,000 limit established by the Federal Acquisition Regulations. *Id.*

Turning to the question of whether Engage established the existence of an implied-in-fact contract, the Board held that it did not. *Id.* at 9-10. Specifically, the Board assumed, without deciding, that Engage had,

through its dealings with Shaughnessy, alleged sufficient facts to establish (1) mutuality of intent to contract, (2) consideration, and (3) lack of ambiguity in offer and acceptance. *Id.* at 10. The Board concluded, however, that Engage had failed to show the fourth element—that Shaughnessy had actual, not merely apparent, authority to bind the government—because nothing in the record corroborated her claim to be a CO representative with such authority. *Id.* at 10-11. Rather, the Board continued, Shaughnessy's then position and job title within the BIA did not suggest that she would have had contracting authority. *Id.* at 11. The Board also concluded that any factual dispute regarding whether King had informed Engage about the absence of a contract was irrelevant for determining actual authority since a CO has no duty to inform a contractor that planned work is unauthorized. *Id.* at 11-12. Finally, the Board discounted any factual dispute created by the affidavit of Engage's Vice President that King gave verbal authority for additional site visits. The Board concluded that the sworn statement (1) lacked expected context (i.e., when and to whom King made this representation); (2) lacked corroboration by contemporaneous documentation; (3) contradicted King's July 28, 2004, letter and October 4, 2002, memorandum; and (4) was not relied upon by Engage to support an implied-in-fact contract in its opposition brief. *Id.* at 12.

Finally, the Board held that the NCLB Act did not authorize the $11,500 worth of services provided by Engage to the Cottonwood Day School. *Id.* at 12-13. The Board determined that Engage's documentation from the school's principal was not a contract, but merely an invitation for further site visits. *Id.* at 12. The Board also concluded that Engage had not alleged or produced any evidence of the requisite conditions for contracting authority under the Act, including, but not limited to, school

board approval of the acquisition and certification by the principal that the cost was fair and reasonable. *Id.* at 12-13.

Engage timely appealed the Board's dismissal to this court. We have jurisdiction pursuant to 41 U.S.C. § 7107(a)(1)(A) (formerly 41 U.S.C. § 607(g)(1)(A)) and 28 U.S.C. § 1295(a)(10).[3]

## DISCUSSION

### A. The Scope of the Board's Jurisdiction

Section 7107(b) (formerly section 609(b)) of Title 41 dictates our standard of review:

> (1) the decision of the agency board on a question of law is not final or conclusive; but (2) the decision on of the agency board on a question of fact is final and conclusive and may not be set aside unless the decision is– (A) fraudulent, arbitrary, or capricious; (B) so grossly erroneous as to necessarily imply bad faith; or (C) not supported by substantial evidence.

Because the question of the Board's jurisdiction to hear Engage's claim under the CDA is an issue of law, "we exercise independent review." *Do-Well Mach. Shop, Inc. v. United States*, 870 F.2d 637, 639 (Fed. Cir. 1989); *see also Emerald Maint., Inc. v. United States*, 925 F.2d 1425, 1428 (Fed. Cir. 1991).

Engage argues that the Board improperly dismissed its appeal for lack of jurisdiction. According to Engage, the CDA grants the Board jurisdiction over appeals taken

---

[3] Subsequent to the Board's decision and some of the briefing in this appeal, Title 41 was recodified pursuant to Act of Jan. 4, 2011, Pub. Law 111-350, 124 Stat. 3677.

"from a decision of a contracting officer of any executive agency . . . relative to a contract made by that agency," and it is undisputed that both King's July 28, 2004, letter and the BIA's March 5, 2008, letter were decisions of BIA COs and that Engage had a contract with the BIA. Appellant Br. 10 (quoting 41 U.S.C. § 607(d), now 41 U.S.C. § 7105(e)(1)(B)). The government disagrees, arguing that the Board did not have jurisdiction because the CDA applies only to "any express or implied contract" with an executive agency, and the Board determined that no express or implied contract existed between Engage and the BIA for the services for which the company claims payment. Appellee Br. 27-28 (citing 41 U.S.C. § 7102(a)).

We agree with Engage that the Board erred in holding that it lacked subject matter jurisdiction over Engage's appeal. The Board read 41 U.S.C. § 602(a) (now codified at 41 U.S.C. § 7102(a)), which limits the reach of the CDA to "any express or implied contract . . . entered into by an executive agency," as requiring Engage to prove that it had either an express or an implied-in-fact contract with the BIA to establish the Board's jurisdiction. *Board Op.*, at 7-8. This analysis, however, runs contrary to our interpretation of a similar provision in the Tucker Act, which vests in the Court of Federal Claims "jurisdiction to render judgment upon . . . *any express or implied contract with the United States . . . .*" 28 U.S.C. § 1491(a)(1) (emphasis added). We have held that jurisdiction under this provision requires no more than a non-frivolous *allegation* of a contract with the government. *See Lewis v. United States*, 70 F.3d 597, 602, 604 (Fed. Cir. 1995); *Gould, Inc. v. United States*, 67 F.3d 925, 929-30 (Fed. Cir. 1995). The Board's analysis also ignores the CDA's jurisdictional statement in 41 U.S.C. § 7105(e)(1)(B), that "[t]he Civilian Board has jurisdiction to decide any appeal from a decision of a contracting officer of any executive agency . . .

relative to a contract made by that agency." The government does not dispute that Engage's appeal to the Board arose "from a decision of a contracting officer" of the BIA. The question remaining, therefore, is whether the CO's decision was "relative to a contract made by that agency." We hold that it was; we hold that, as under the Tucker Act, a plaintiff need only allege the existence of a contract to establish the Board's jurisdiction under the CDA "relative to" an express or implied contract with an executive agency.

Courts frequently confuse or conflate the distinction between subject matter jurisdiction and the essential elements of a claim for relief. *See, e.g.*, *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 503, 511 (2006) ("On the subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy, this Court and others have been less than meticulous."); *Moden v. United States*, 404 F.3d 1335, 1340 (Fed. Cir. 2005). The Supreme Court's decision in *Bell v. Hood*, 327 U.S. 678 (1946), is instructive. In *Bell*, the petitioners brought suit against FBI officers for alleged violations of their Constitutional rights under the Fourth and Fifth Amendments. *Id.* at 679. The respondents defended the district court's dismissal for lack of federal subject matter jurisdiction on the ground that, *inter alia*, the petitioners could not recover damages based on their Constitutional claims. *Id.* at 680-81. The Court disagreed and reversed the dismissal, holding that the petitioners' complaint adequately stated a claim arising under the Constitution of the United States and that "[j]urisdiction . . . is not defeated as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Id.* at 682. Rather, the Court continued, "it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of

jurisdiction." *Id.*; *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 135-36 (2007).

This court followed the reasoning of *Bell* in *Gould*, 67 F.3d at 929-30, and *Lewis*, 70 F.3d at 602, 604. In *Gould*, a contractor appealed a CO's adverse decision to the Court of Federal Claims under the CDA. 67 F.3d at 927-28. The Court of Federal Claims dismissed on jurisdictional grounds, holding that the contractor's allegation that its procurement contract with the Navy was void for illegality divested the court of Tucker Act jurisdiction for want of a contract. *Id.* at 928. We disagreed and held that alleging a contract with the government suffices to trigger the Tucker Act's grant of jurisdiction "upon any express or implied contract with the United States," and that the proper basis for a dismissal, if warranted, was the failure to state a claim upon which relief can be granted. *Id.* at 929-30. Similarly, in *Lewis*, we held that, when the Court of Federal Claims determines that the plaintiff has failed as a matter of law to establish the existence of an alleged contract with the government, the proper disposition is to dismiss for failure to state a claim, rather than for lack of jurisdiction.[4] 70 F.3d at 602, 604; *see also Do-Well Mach.*, 870 F.2d at 639-40 (holding that a valid affirmative defense—that the contractor's claim is time barred—did not divest the Armed Services Board of Contract Appeals of jurisdiction, although it may give rise to a successful motion for summary judgment or dismissal

---

[4] In contrast, we have held that, for Tucker Act jurisdiction "the determination of whether a claim's source is money-mandating 'shall be determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action.'" *Moden*, 404 F.3d at 1341 (quoting *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005)).

for failure to state a claim). More broadly we have ex-
plained:

> To the extent a successful claim against
> the government requires compliance with
> all statutory elements of the claim, failure
> of proof of an element of the cause of ac-
> tion means the petitioner is not entitled to
> the relief he seeks. To conclude in such a
> case that the petitioner loses because the
> forum is "without jurisdiction" is to ob-
> scure the nature of the defect. It would be
> more accurate to conclude that the peti-
> tioner has failed to prove the necessary
> elements of a cause for which relief could
> be granted.

*Spruill v. Merit Sys. Prot. Bd.*, 978 F.2d 679, 687 (Fed.
Cir. 1992).

   B. Claims Relating to Site Visits Between
      2002 and 2004

Applying the reasoning set forth above to section
7105(e)(1)(B) of the CDA, Engage's allegations of a con-
tract, either express or implied-in-fact, with the BIA for
services rendered in 2002 and 2004 suffice to establish the
Board's jurisdiction "relative to a contract" with the BIA.
In this case, it is undisputed that Engage had an express
contract with the BIA, PO 020259, which included
$36,000 for site visits to BIA schools. In its appeal, En-
gage sought $80,485 for additional site visits in 2002,
claiming entitlement under PO 020259, as modified by
amendments to requisition K00E20-2-27, as one of its
theories of recovery. Accordingly, Engage's appeal to the
Board on this claim undoubtedly met the jurisdictional
requirements of section 607(d): Engage's appeal was
taken from a decision of a BIA CO denying payment

under PO 020259, a contract made by the BIA. The determination of whether PO 020259 was in fact modified to include the unpaid services is not jurisdictional; it is a decision on the merits. *See Bell*, 327 U.S. at 682.

Engage also triggered the Board's jurisdiction by claiming a right to payment of the $80,485 relating to site visits based on its assertion of an implied-in-fact contract with the BIA. As under the Tucker Act, the Board's jurisdiction under the CDA does not depend on the undisputed existence of a contract between a provider and an agency. Rather, a claim that an individual or a company has a contract with an executive agency meets the jurisdictional requirement that a CO's decision denying payment under the alleged contract is "relative to a contract" with that agency. 41 U.S.C. § 7105(e)(1)(B). As with a dispute over the scope of an acknowledged contract, the determination of whether or not a contract in fact exists is not jurisdictional; it is a decision on the merits. *See Bell*, 327 U.S. at 682. Consequently, the Board erred in requiring Engage to prove, at this juncture, the existence of a contract.

Mastering the distinction between a dismissal for lack of jurisdiction and a dismissal on the merits "is not merely an intellectual exercise without practical utility." *Do-Well Mach.*, 870 F.2d at 640. First, a dismissal on the merits usually carries *res judicata* effect whereas a dismissal for lack of jurisdiction typically does not. *See id.* (citing *Vink v. Hendrikus Johannes Schijf, Rolkan N.V.*, 839 F.2d 676, 677 (Fed. Cir. 1988)). Under the CDA, a contractor may appeal the decision of a CO to the Board or to the Court of Federal Claims. 41 U.S.C. § 7104(b)(1). Thus, to avoid the risk of revisiting this case in the Court of Federal Claims, the government must procure a judgment from the Board on the merits. *See Do-Well Mach.*, 870 F.2d at 640.

Second, a court's characterization of a decision as jurisdictional rather than as on the merits affects its treatment of disputed facts. In deciding a motion to dismiss for failure to state a claim, the trial court must accept as true the factual allegations in the complaint. *See Hughes v. Rowe*, 449 U.S. 5, 10 (1980); *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 n.13 (Fed. Cir. 1993). And, at the summary judgment stage, the court must identify but may not decide factual disputes; at this stage, the court's function is not to make credibility determinations and weigh the evidence so as to determine the truth, but rather to determine whether a genuine factual dispute exists for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986). In contrast to a motion to dismiss for failure to state a claim, in deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true only uncontroverted factual allegations in the complaint. *Cedars-Sinai*, 11 F.3d at 1583-84. And, unlike at summary judgment, disputed facts outside the pleadings are subject to the fact finding of the court. *Id.*; *see also Arbaugh*, 546 U.S. at 514.

Thus, by characterizing the question of whether a contract exists as a jurisdictional one, the Board permitted itself to resolve, rather than merely identify, genuine issues of disputed fact underlying Engage's contract claim. *See Board Op.*, at 7. Specifically, the Board discounted as not credible the testimony of Engage's Vice President that King verbally authorized Engage to conduct four site visits to thirty-two Indian schools during the 2002-2003 school year. *Id.* at 12. The Board also discounted as uncorroborated Shaughnessy's testimony that she was a CO representative with authority to authorize the work performed by Engage. *Id.* at 11. On the current record, these sworn statements raise genuine issues of material fact regarding the existence of a con-

tract for the site visits performed by Engage, precluding affirmance based on the government's alternative motion for summary judgment.

It appears, moreover, that questions regarding the propriety of further discovery and the admissibility of certain evidence remain.  The current record includes King's October 4, 2002, memorandum from the OIG's file, even though Engage's attorney has been denied access to this file.  Engage alleges that this memorandum is both inadmissible and unreliable, but the Board did not address this issue.

For these reasons, we vacate the Board's dismissal on jurisdictional grounds and remand this portion of Engage's appeal for further proceedings on the merits consistent with this opinion.

C. The Claim Relating to Services to Cottonwood Day School in 2004

With regard to Engage's theory that the NCLB Act authorized $11,500 in services provided to the Cottonwood Day School in 2004, we find that the Board erred in dismissing this claim on jurisdictional grounds, but affirm based on the government's alternative motion to dismiss for failure to state a claim.  *See Adair v. United States*, 497 F.3d 1244, 1251 (Fed. Cir. 2007) (affirming the dismissal on the alternative ground of failure to state a claim) ("That the Court of Federal Claims based its dismissal on lack of subject matter jurisdiction, however, is not fatal to the judgment of dismissal.").

On the jurisdictional issue, Engage asserted that these services were rendered pursuant to a contract authorized under the NCLB Act and points to a request executed by a qualified "supervisor" under the Act.  As with regard to its other claims, because these allegations

are non-frivolous assertions of the existence of a contract under the Act, the Board may not decline to consider them on jurisdictional grounds. Once it exercises jurisdiction, however, the Board may assess—without resolving any factual disputes—whether the claim is one upon which it can grant relief. *See id.* Contracting authority under the NCLB Act requires that five conditions be satisfied. *See supra.* As the Board found, however, Engage failed to allege at least two of the five requisite conditions: that the school board approved the acquisition or that the principal certified that the cost was fair and reasonable. *Board Op.*, at 12-13. Engage does not contest the absence of these conditions on appeal. Accordingly, we affirm the Board's dismissal of Engage's NCLB Act claim.

### CONCLUSION

For the foregoing reasons, the Board's decision dismissing Engage's appeal is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.

## AFFIRMED IN PART, VACATED IN PART, and REMANDED