**LIBERTY AMMUNITION, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 11–84C.**

United States Court of Federal Claims.

Oct. 31, 2011.

Stephen B. Judlowe, McElroy, Deutsch, Mulvaney & Carpenter, LLP, New York, New York, for plaintiff. With him on the briefs were Joseph P. LaSala, McElroy, Deutsch, Mulvaney & Carpenter, LLP, New York, New York, and Lawrence E. Bathgate, II and Daniel F. Corrigan, Bathgate, Wegener & Wolf, P.C., Lakewood, New Jersey.

Walter W. Brown, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, and John Fargo, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Stephen C. Tosini, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

Plaintiff has brought this patent case pursuant to 28 U.S.C. § 1498(a) with attendant breach-of-contract and unfair-competition claims. At issue are intellectual property rights to the so-called "Green Bullet." The Department of Defense embarked on a quest for this munition some years ago, seeking a lead-free bullet that was less harmful to the environment than its predecessor but still just as lethal. The U.S. Army has made significant strides in this area, and now such ammunition is standard issue for America's troops.

Liberty Ammunition, Inc. ("Liberty" or "plaintiff") claims that the government achieved this success by infringing on its patent. Liberty further alleges that the government violated several non-disclosure agreements ("NDAs") concerning its patented bullet design. Lastly, it avers that the government is unfairly claiming credit for Liberty's breakthroughs.

The government concedes that this court has jurisdiction over the patent claim, stated in Liberty's complaint as Count I, based upon 28 U.S.C. § 1498(a). *See* Def.'s Mot. to Dismiss Counts II and III ("Def.'s Mot.") at 3 n. 3. Jurisdiction is contested over Liberty's two non-patent claims. The government has moved to dismiss those claims for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), *id.* at 1, or alternatively, the government asks the court to dismiss Liberty's breach-of-contract claim pursuant to RCFC 12(b)(6). *Id.*

## BACKGROUND

On October 21, 2005, Mr. PJ Marx applied for a patent for a new bullet "designed to

overcome the disadvantages and problems associated with conventional firearm projectiles." First Am. Compl. Ex. A, at 8. Mr. Marx's bullet consists of three components: a nose portion, a tail portion, and a surrounding sheath or "interface" that connects these two parts. *Id.* Ex. A, at 1. When the bullet strikes a person or animal (euphemistically referred to as a "soft target"), the interface ruptures and the nose and tail portions separate. *Id.* Ex. A, at 8–9. On July 6, 2010, the U.S. Patent and Trademark Office issued U.S. Patent No. 7,748,325 for Mr. Marx's invention. *Id.* at 1.

The patent highlights a number of benefits of this design. The interface obviates the need for a lead outer jacket, making the bullet more environmentally friendly and putting less wear on the gun barrel. First Am. Compl. Ex. A, at 8. The bullet's tripartite design makes it effective against a wide array of targets: it will pass straight through many hard targets (*e.g.,* a car windshield) but will fragment and lodge inside a soft target (*e.g.,* an enemy combatant). *Id.* at 9–10. Moreover, the nose or tail portion can be engineered to carry a chemical payload, such as an anti-coagulant or tracking agent, which may be released upon hitting a soft target. *Id.* Ex. A, at 9. The patent also notes that the new bullet can be manufactured more affordably than other customized projectiles currently under development. *Id.*

Both shortly before and shortly after Mr. Marx applied for his patent, he entered into three separate NDAs concerning his ballistics research. *See* First Am. Compl. Exs. B–D. The first NDA was between Mr. Marx and the "United States Government, Department of Defense." *Id.* Ex. B, at preamble. This agreement was signed on February 17, 2005 by three individuals: Mr. Marx, Major Glenn A. Dean of the U.S. Army, and John W. Amick. The latter two persons are shown as having a principal place of business at Fort Benning, Georgia, and as signing the NDA on behalf of the United States. *Id.* Ex. B, at 3. The second NDA was signed by Mr. Marx and Thomas A. "Tucker" Campion on June 23, 2005. *Id.* Ex. C, at 3. The document identifies Mr. Campion's principal place of business as MacDill Air Force Base, Florida. *Id.* Ex. C, at 1. The third NDA was signed by Mr. Marx and Charles Marsh on January 11, 2006. *Id.* Ex. D, at 3. The agreement states that Mr. Marsh's principal place of business was the Crane Naval Surface Warfare Center, Indiana. *Id.* Ex. D, at 1.

The texts of the Campion and Marsh NDAs are identical except for the name of the countersigning party. *See* First Am. Compl. Exs. C, D. The Dean NDA is worded slightly differently but has the same gravamen as the other two. *See id.* Ex. B. Each of these NDAs provided that the countersigning party would keep secret all confidential information disclosed by Mr. Marx. *E.g., id.* Ex. B, at ¶¶ 2.1–.2, 3.1.[1] Both Liberty and the government agree that Mr. Marx supplied the Department of Defense with information pertaining to bullet design pursuant to these agreements. First Am. Compl. at ¶ 14; Hr'g Tr. 21:2–8, 48:6–8 (Oct. 4, 2011).[2]

All three NDAs state that "[n]either Party may sell, transfer, or assign this Agreement except to entities completely controlling or controlled by that Party or to entities acquiring all or substantially all of its assets, without the prior written consent of the other." *E.g.,* First Am. Compl. Ex. B at ¶ 3.6. When Mr. Marx signed these three NDAs, he was acting as a sole proprietorship. First Am. Compl. at ¶ 14. Since then, his business has undergone a series of transformations. First it became Liberty Ammunition Inc., a Florida corporation; then Liberty Ammunition LLC, a Delaware Limited Liability Company; and lastly Liberty Ammunition Inc., a Delaware corporation. Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss Counts II and III ("Pl.'s Opp'n") Ex. 2, at ¶ 10 (Aff. of PJ Marx (Aug. 27, 2011) ("Marx Aff.")). Mr. Marx

---

1. Under the phrasing of the agreements, theoretically Mr. Marx could have received confidential information from the other party and been bound to secrecy. *See e.g.,* First Am. Compl. Ex. B, at preamble. However, neither Liberty nor the government has suggested that Mr. Marx was given confidential information.

2. Subsequent citations to the transcript of the hearing conducted on October 4, 2011 will omit the date.

avers that at each step in this progression, all assets and liabilities of the original business were subsumed in the successor entity. *Id.* at ¶¶ 11–12. To emphasize this point, on July 11, 2011, Mr. Marx signed a quitclaim deed giving Liberty Ammunition Inc. "all right, title and interest still reposing in me, if any and I do not believe there is any," in the sole proprietorship. Pl.'s Opp'n Ex. 3, at 1 (deed entitled "Confirmatory Conveyance and Quitclaim of Assets and Liabilities"). For its part, the government notes the lack of contemporaneous documentation for the alleged transmission of the sole proprietorship's assets and liabilities. Def.'s Reply at 4.

In 2010, the U.S. Army announced the development of the 5.56mm M855A1 Enhanced Performance Round (EPR). Pl.'s Opp'n Ex. 1, at p. 3 of 31. The new bullet is lead-free and improves upon the design of its predecessor, the M855. *Id.* Since June 2010, the Army has fielded tens of millions of rounds of the M855A1 EPR in Afghanistan. *Id.* Ex. 1, at p. 22 of 31. According to Liberty, this ammunition was produced by Alliant Techsystems. Pl.'s Opp'n at 9.

Liberty alleges that the M855A1 EPR copies its patented bullet design. First Am. Compl. at ¶ 8. It further claims that the government violated the terms of the NDAs by disclosing Mr. Marx's confidential information to potential vendors, including Alliant Techsystems. *Id.* at ¶ 15; Pl.'s Opp'n at 2, 9. Lastly, Liberty alleges that the government has unfairly taken credit for Mr. Marx's work. First Am. Compl. at ¶ 20; Pl.'s Opp'n at 8–10. It points to a number of press releases, presentations, and articles in which the Army holds itself out as the designer of the M855A1 EPR. Pl.'s Opp'n Ex. 1; *see also id.* at 9–10.

The government denies all of these allegations. It claims that the Department provided Mr. Marx's confidential information to the Picatinny Arsenal but nowhere else. Hr'g Tr. 21:9–16. According to the government, personnel at Picatinny Arsenal reviewed Mr. Marx's samples and schematics, found them wanting, and decided to proceed with an in-house design that eventually resulted in the M855A1 EPR. Hr'g Tr. 21:15–22:5. Conse-

quently, the government also denies that the Army has unfairly taken credit for Mr. Marx's innovation.

## Standards for Decision

### A. Subject Matter Jurisdiction

"Jurisdiction must be established as a threshold matter before the court may proceed with the merits of this or any other action." *OTI Am., Inc. v. United States,* 68 Fed.Cl. 108, 113 (2005) (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). As plaintiff, Liberty "bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence." *M. Maropakis Carpentry, Inc. v. United States,* 609 F.3d 1323, 1327 (Fed.Cir.2010) (citing *Radioshack Corp. v. United States,* 566 F.3d 1358, 1360 (Fed.Cir.2009)); *see also McNutt v. General Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988). In determining whether subject matter jurisdiction exists, the court "accepts as true the undisputed allegations in the complaint, and draws all reasonable inferences in favor of the plaintiff." *De Maio v. United States,* 93 Fed.Cl. 205, 209 (2010) (citing *Hamlet v. United States,* 873 F.2d 1414, 1415–16 (Fed. Cir.1989)).

To establish subject matter jurisdiction over a suit against the federal government, a plaintiff must show both a "waiv[er of] sovereign immunity together with a claim falling within the terms of the waiver." *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (citations omitted). The Tucker Act serves as a waiver of sovereign immunity and grants this court jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Nonetheless, "[t]he Tucker Act itself does not create a substantive cause of action; ... to come within the jurisdictional

reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States,* 402 F.3d 1167, 1172 (Fed.Cir.2005) (*en banc* portion) (citing *United States v. Mitchell,* 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)). Allegations of a contract with the government and breach of that contract can suffice for this purpose, so long as monetary relief is sought. *See Ransom v. United States,* 900 F.2d 242, 244 (Fed.Cir.1990); *Speed v. United States,* 97 Fed.Cl. 58, 64, 65–68 (2011).

### B. *Statement of a Claim Upon Which Relief Can Be Granted*

"To survive a motion to dismiss [for failure to state a claim upon which relief can be granted], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The allegations contained in the complaint must indicate to the court that there is "more than a sheer possibility that a defendant has acted unlawfully;" "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 555, 556, 127 S.Ct. 1955).

In performing this analysis, the court must construe the allegations of the complaint in the light most favorable to the plaintiff. *See Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995); *see also Hamlet,* 873 F.2d at 1416. It must decide " 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511, 122 S.Ct. 992, 152

L.Ed.2d 1 (2002) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds as noted in Francis v. Giacomelli,* 588 F.3d 186, 192 n. 1 (4th Cir.2009)).

### ANALYSIS

#### A. *Contract Claims*

■ The government argues that the Anti–Assignment Act bars subject matter jurisdiction over Count II of Liberty's complaint alleging breach of the NDAs.[3] One of the twinned acts comprising the Anti–Assignment Act, the Assignment of Contracts Act, provides that "[n]o contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned." 41 U.S.C. § 15(a). According to the government, Liberty has not shown that the NDAs survived when Mr. Marx assigned them to Liberty Ammunition Inc. Def.'s Mot. at 6–8. The government contends that if the three contracts were voided by the Anti–Assignment Act, Liberty would lack privity of contract with the United States and this court would lack subject matter jurisdiction. *Id.* at 6.

■ Although some precedent from this court supports the government's jurisdictional position, *see Insurance Co. of the W. v. United States,* 100 Fed.Cl. 58 (2011), the Federal Circuit has unambiguously held that "jurisdiction under [the Tucker Act] requires no more than a non-frivolous *allegation* of a contract with the government," *Engage Learning, Inc. v. Salazar,* 660 F.3d 1346, 1353 (Fed.Cir.2011) (citing *Lewis v. United States,* 70 F.3d 597, 602 (Fed.Cir.1995); *Gould, Inc. v. United States,* 67 F.3d 925, 929–30 (Fed.Cir.1995)).[4] The actual *exis-*

3. The Anti–Assignment Act consists of two statutory provisions: (1) the Assignment of Contracts Act, 41 U.S.C. § 15(a), prohibits the assignment of government contracts, and (2) the Assignment of Claims Act, 31 U.S.C. § 3727, bars the assignment of claims against the United States. *See Delmarva Power & Light Co. v. United States,* 542 F.3d 889, 892 (Fed.Cir.2008); *Rochester Gas &*

*Elec. Corp. v. United States,* 65 Fed.Cl. 431, 436, 440 (2005).

4. That there should be some confusion on this matter is not surprising. The Supreme Court has noted that "[o]n the subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy, this Court and others have been less than meticulous." *Arbaugh v. Y & H Corp.,* 546 U.S. 500,

*tence* of a contract is not a jurisdictional matter but rather a decision on the merits of the case. *Engage Learning*, 660 F.3d at 1354–55 (citing *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). For the purposes of jurisdiction, a plaintiff need merely show that a contract with the government underlies its claim. *See Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997) ("A well-pleaded allegation in the complaint is sufficient to overcome challenges to jurisdiction.").

For this reason, the Federal Circuit has corrected trial courts for granting a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) when the plaintiff alleges a contract—even if the appellate court agrees that no contract actually existed. For example, in one case, the plaintiff sued the United States based on an alleged implied contract for a tax refund. *See Brach v. United States*, 98 Fed.Cl. 60, 65 & n. 10 (2011), *aff'd on other grounds*, 443 Fed.Appx. 543, 2011 WL 4821969 (Fed.Cir.2011). The trial court granted the government's motion to dismiss for lack of subject matter jurisdiction on the grounds that no contract existed between the plaintiff and the IRS, but the Federal Circuit held that the trial court possessed jurisdiction over the case based on the plaintiff's allegation of a contract. *Brach*, 443 Fed.Appx. at 546, 2011 WL 4821969, at *3. ("To invoke the court's jurisdiction, all that was required of Mr. Brach was to allege the existence of a contract as a basis for relief." (citing *Gould*, 67 F.3d at 929)). The court of appeals recognized this jurisdiction despite ultimately concurring with the trial court that there was no contract between the plaintiff and the government. *Id.* at 547, 2011 WL 4821969, at *4 ("Reviewing the [alleged contract], we see no indication of . . . an agreement [for a tax refund]."); *see also Engage Learning*, 660 F.3d at 1356 (finding that "the Board erred in dismissing this claim on jurisdictional grounds" even though the plaintiff "failed to allege at least two of the five requisite conditions" for the forma-

tion of a contract); *Trauma Serv.*, 104 F.3d at 1325.

Here, Liberty has presented a non-frivolous allegation of contracts with the government. *See* First Am. Compl. at ¶¶ 13–17. In support, Liberty has attached to its complaint copies of NDAs signed by military officers and officials of the Department of Defense, acting in their governmental capacities. *Id.* Exs. B, C, D. Liberty has also pled that these contracts were legally assigned to it. First Am. Compl. at ¶ 14. Although the government has raised challenges to these contracts, *see* Hr'g Tr. 17:12–22 (questioning whether Mr. Marx properly assigned his interest in the contracts to Liberty Ammunition Inc.), 66:14 to 67:20 (expressing doubt that any of the signatories had authority to sign on behalf of the United States), these challenges go to the ultimate validity of the contracts. The government does not and indeed cannot argue that Liberty's contract claim is so baseless as to constitute a frivolous allegation. Under the law of this circuit, Liberty's complaint suffices to vest the court with jurisdiction. *See Engage Learning*, 660 F.3d at 1352–53. Consequently, the court must deny the government's motion to dismiss Count II for lack of subject matter jurisdiction.

In the alternative, the government urges this court to dismiss Count II for failure to state a claim upon which relief can be granted. Def.'s Mot. at 1. The government's argument in support of this motion made under RCFC 12(b)(6) is essentially the same as its jurisdictional argument, *i.e.*, that the Anti–Assignment Act voided the NDAs when they were assigned because their transfer did not fall under any of the exceptions to the Act. Def.'s Mot. at 6–8.

As the government concedes, courts have recognized a number of exceptions to the Anti–Assignment Act under which a government contract can be validly assigned to another party. *See* Def.'s Mot. at 6–7. Liberty has made out at least a prima facie case that it may qualify for two of these exceptions.

### 1. The waiver exception.

■■■ The first major exception is waiver. "Despite the bar of the Anti–Assignment statute, the [g]overnment, if it chooses to do so, may recognize an assignment." *Tuftco Corp. v. United States*, 614 F.2d 740, 745 (Ct.Cl.1980) (quoting *Maffia v. United States*, 163 F.Supp. 859, 862 (Ct.Cl.1958)). Courts have rejected a simple litmus test "to determine whether the government has waived the Anti–Assignment Act," looking instead to "the totality of the circumstances." *Haddon Hous. Assocs., LLC v. U.S.*, 99 Fed. Cl. 311, 322 (2011) (citing *Kawa v. United States*, 86 Fed.Cl. 575, 591 (2009) (which in turn cites *Tuftco*, 614 F.2d at 745–46)).

Here, the NDAs contain waiver-type clauses which expressly permit assignments to a business acquiring all the assets of Mr. Marx's sole proprietorship. *See, e.g.,* First Am. Compl. Ex. B, at ¶ 3.6 ("Neither Party may ... assign this Agreement *except to entities completely controlling or controlled by that Party or to entities acquiring all or substantially all of its assets,* without prior written consent of the other." (emphasis added)). Liberty alleges that this condition has been met at each step in the corporate metamorphosis from the sole proprietorship to its current corporate incarnation. First Am. Compl. at ¶ 14. Consequently, it argues, the government has waived the Anti–Assignment Act for these assignments. Pl.'s Opp'n at 17–18.

■■■ The government argues vigorously that this exception applies only to assignments recognized by the government after the fact. *See* Def.'s Supplemental Br. It claims that government officials cannot waive the Anti–Assignment Act prospectively or preemptively. *Id.* Admittedly, in the majority of cases finding a waiver of the Act, the government's waiver occurred after the transfer. In those instances, "to determine whether the government has waived the Anti–Assignment Act, [the court] considers particularly whether: (1) the assignor or assignee sent notice of the purported assignment to the government; (2) the contracting officer signed the notice of assignment; (3) the contracting officer modified the contract according to the assignment; and (4) the government sent payment to the assignee pursuant to the assignment." *Haddon Hous.,* 99 Fed.Cl. at 322 (citing *Kawa,* 86 Fed.Cl. at 591). However, just because most waivers have taken the form of *ex post facto* recognitions does not mean that this is the *only* method for waiving the Act.

The government has cited no case where a federal court rejected a prospective or preemptive waiver of the Anti–Assignment Act. To the contrary, whenever the issue has arisen, courts have found such a waiver to be effective. In *Rochester Gas and Electric Corp. v. United States,* 65 Fed.Cl. 431 (2005), this court upheld the validity of an assignment when the assignor complied with the waiver clause in the contract. *Id.* at 439 ("The assignment also conformed to the requirement of the Standard Contract[, which] permits assignments, provided that notice of any such transfer be provided to DOE within ninety days of transfer."); *see also Dominion Res., Inc. v. United States,* 641 F.3d 1359, 1362–64 (Fed.Cir.2011). The government tries to differentiate the instant case because the standard contract clause in *Rochester Gas* was authorized statutorily by Congress in the Nuclear Waste Policy Act; yet the court in that case drew no such distinction. To the contrary, *Rochester Gas* stated:

> Under the [Anti–Assignment] Act, inclusion of an assignment clause in the contract itself has been treated as governmental recognition and consent to an assignment. Thus, [the assignment clause] of the Standard Contract would constitute governmental recognition and consent under the [Anti–Assignment] Act *wholly apart from the statutory grant of authority for assignments* in [the Nuclear Waste Policy Act].

65 Fed.Cl. at 439 n. 8 (emphasis added) (internal citation omitted); *see also Vermont Yankee Nuclear Power Corp. v. United States,* 73 Fed.Cl. 236, 240 (2006) ("The [g]overnment consents to an assignment when it signs a contract that permits the assignment." (citing *Rochester Gas,* 65 Fed. Cl. at 437)).

Similarly, in *Monchamp Corp. v. United States,* 19 Cl.Ct. 797 (1990), a disappointed

bidder for a timber sale contract with the Forest Service alleged that the winning bidder's assignment of rights to another party contravened the Anti–Assignment Act, notwithstanding a provision in the sales contract allowing such an assignment. *Id.* at 799–800. The court squarely rejected that contention explaining that "[i]t is well settled that the [g]overnment may waive the provisions of the Anti–Assignment Act, as it did in the instant case by including clause BT8.4[, *i.e.*, the assignment clause,] into the Timber Sale contract." *Id.* at 801.[5]

*Dominion Resources, Rochester Gas,* and *Monchamp* confirm the common-sense conclusion that the government may effectively waive the Anti–Assignment Act by an expressly stated condition in a contract. Consequently, Liberty has alleged facts sufficient to support a claim upon which relief can be granted.

### 2. The "operation of law" exception.

■ Another exception to the Anti–Assignment Act is assignment by operation of law. *See Tuftco,* 614 F.2d at 745 ("Perhaps the most significant exception ... is when transfer of a ... contract is effected by consolidation or merger to the successor of a claimant corporation." (citing *Seaboard Air Line Ry. v. United States,* 256 U.S. 655, 41 S.Ct. 611, 65 L.Ed. 1149 (1921))); *see also L–3 Commc'ns Integrated Sys., L.P. v. United States,* 84 Fed.Cl. 768, 777 (2008) ("Where a transfer is incident to the sale of an entire business or the sale of an entire portion of a business, ... the assignment is exempted from the anti-assignment statute." (citing *Lyons Sec. Servs., Inc. v. United States,* 38 Fed.Cl. 783, 786 (1997))). In these cases, "the contract with the [g]overnment continues with essentially the same entity, which has undergone a change in its corporate form or ownership." *L–3,* 84 Fed.Cl. at 777. Lib-

erty alleges that it meets the criteria of the "operation of law" exception because the sole proprietorship transferred all of its assets to Liberty Ammunition Inc., a Florida corporation, which then underwent a series of corporate reorganizations until it reached its present status. First Am. Compl. at ¶ 14; *see also* Marx Aff. at ¶¶ 10–11. According to Liberty, Mr. Marx's interest in the NDAs was assigned by operation of law in each of these transformations. Pl.'s Opp'n at 13–17. This allegation and the attendant documentary materials suffice to render unavailing a motion to dismiss for failure to state a claim.

### 3. Synopsis.

At this stage of the litigation, the record does not permit the court to say conclusively whether Liberty qualifies for either of these exceptions. The allegations in the complaint and the evidentiary materials appended to it are subject to evidentiary proofs and challenges. Both parties will have the opportunity at trial to show whether the requisite factual elements are present for the invocation *vel non* of exceptions to the Anti–Assignment Act. Regardless of the ultimate applicability of these exceptions, Liberty's complaint alleges facts which, if proven true, "state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678, 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). That is all that is required to survive a motion under RCFC 12(b)(6). Thus the court must deny the government's motion to dismiss Count II for failure to state a claim upon which relief can be granted.

### B. Unfair Competition Claims

The government contends that this court lacks subject matter jurisdiction over Liberty's claims in Count III, stated first under Section 43(a) of the Lanham Act, codified as amended at 15 U.S.C. § 1125(a), and then

---

5. Courts have gone even further to give effect to a waiver clause that was much less explicit than the ones addressed in *Rochester Gas* and *Monchamp* or the clauses in the NDAs at issue in this case. *See Forest Glen Props., LLC v. United States,* 79 Fed.Cl. 669 (2007). There, the clause stated that (1) the contract would continue in effect in the event of an assignment, and (2) the contractor "agrees that it ... will not make any sale, assignment, or conveyance or transfer in

any fashion, of this Contract ... without the prior written consent of HUD." *Id.* at 671–72. The court found that the contract "recognizes the power of the 'Owner' to assign the contract" even absent written consent: failure to obtain prior approval "would not change the fact that the assignment occurred [but rather] would constitute a default entitling [the government] to exercise certain contractual rights." *Id.* at 682.

under a state unfair-competition law, the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201–.213. Def.'s Mot. at 8–9; *see* First Am. Compl. at ¶ 21. Liberty acknowledges that this court lacks original jurisdiction over these claims, but urges the court to exercise pendent jurisdiction over them. Pl.'s Opp'n at 21–22.

Pendent jurisdiction is the power of a court "to hear and determine a claim over which it would not otherwise have jurisdiction, because the claim arises from the same transaction or occurrence as another claim that is properly before the court." *Black's Law Dictionary* 930 (9th ed. 2009). The doctrine traces back to such "ancillary jurisdiction" decisions as *Siler v. Louisville & Nashville R.R.*, 213 U.S. 175, 191, 29 S.Ct. 451, 53 L.Ed. 753 (1909), *abrogated in part on other grounds by Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117–20, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), and before that to *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 823, 6 L.Ed. 204 (1824) (Marshall, C.J.). Although the doctrine was modified in *Hurn v. Oursler*, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933), the "modern" test for pendent jurisdiction is stated in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), as a two-part test:

> Pendent jurisdiction, in the sense of judicial *power*, exists whenever there is a claim "arising under [the] Constitution, the Laws of the United States, and Treatises made, or which shall be made, under their Authority ...," U.S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that

the entire action before the court comprises but one constitutional "case."

*Id.* at 725, 86 S.Ct. 1130.

The Court of Claims initially viewed the *Gibbs* iteration of the doctrine with some trepidation and questioned whether it might only be exercised by the district courts. *See Lockridge v. United States*, 218 Ct.Cl. 687, 689 (1978) ("The role of 'pendent jurisdiction' in this court is uncertain." (citing *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1012 (Ct.Cl.1967), *recognized as overruled in Claude E. Atkins Enterprises, Inc. v. United States*, 15 Cl.Ct. 644, 647 n. 4 (1988))). Since then, that court and its successor, the Court of Federal Claims, have become more receptive to the doctrine and have employed it on occasion. *See Trek Leasing, Inc. v. United States*, 62 Fed.Cl. 673, 678 (2004) ("[I]t has been noted that pendent jurisdiction is specifically available to the court." (citing *Kennedy v. United States*, 19 Cl.Ct. 69, 76 (1989) ("Pendent jurisdiction may be assumed ... at the [c]ourt's discretion in the interests of judicial economy, convenience and fairness." (citing *Gibbs*, 383 U.S. at 725–26, 86 S.Ct. 1130)))).

 That being said, the doctrine of pendent jurisdiction does not give the court *carte blanche* to consider any matter connected to a claim properly before it. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 559, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) ("Once the court determines it has original jurisdiction over the civil action, it can turn to the question whether it has a constitutional and statutory basis for exercising supplemental jurisdiction over the other claims in the action.").[6] In particu-

---

6. For district courts, the doctrine of pendent jurisdiction, renamed "supplemental jurisdiction," was legislatively codified by Congress in 1990 as 28 U.S.C. § 1367. *See* Judicial Improvements Act of 1990, Pub.L. No. 101–650, § 310(a), 104 Stat. 5089, 5113. That statute provides in part that

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). This structuring of the doctrine was construed and applied by the Supreme Court in the *Exxon Mobil* case. *See* 545 U.S. at 549, 125 S.Ct. 2611.

Although 28 U.S.C. § 1367 does not pertain to this court, the doctrine of pendent jurisdiction as explicated in *Gibbs* has a broader application and constitutes a part of this court's jurisprudence. *See Trek Leasing*, 62 Fed.Cl. at 678; *cf. Hoag v. United States*, 99 Fed.Cl. 246, 252 n. 2 (2011) (addressing the inapplicability of 28 U.S.C. § 1367 to this court). *But cf. Waltner v. United States*, 98 Fed.Cl. 737, 764–65 (2011) (refusing to exercise supplemental jurisdiction over a plaintiff who had relied solely upon 28 U.S.C. § 1367 as a basis for pendent jurisdiction in this

lar, "the assumption of pendent jurisdiction may not contradict congressional action." *Trek Leasing*, 62 Fed.Cl. at 679 (citing *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978) (which in turn relied upon *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976)))[7] Thus, the court must consider the underlying statutory framework to determine whether Congress "expressly or by implication negated the exercise of jurisdiction" over the pendent claim. *Lockridge*, 218 Ct.Cl. at 690 (quoting *Aldinger*, 427 U.S. at 18, 96 S.Ct. 2413) (internal quotation marks omitted). For instance, the court's pendent jurisdiction "does not extend to powers specifically excluded from the [c]ourt's jurisdiction, such as claims 'sounding in tort.'" *American Renovation & Constr. Co. v. United States*, 65 Fed.Cl. 254, 260 (2005) (quoting 28 U.S.C. § 1491(a)); *see also Ullman v. United States*, 64 Fed.Cl. 557, 564–65 (2005). This particular limitation stems not only from the strictures of the Tucker Act, but also from the fact that "trial jurisdiction over claims under the [Federal] Tort Claims Act is specifically given to the district courts and those courts only." *Strick Corp. v. United States*, 625 F.2d 1001, 1010 (Ct.Cl.1980) (citing 28 U.S.C. §§ 1346(b), 2679).

 In the present case, the court cannot exercise pendent jurisdiction over plaintiff's Lanham Act claim without contradicting congressional action for two reasons. First, violations of the Lanham Act sound in tort. *See American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1433 (3d Cir.1994) ("The [Lanham] Act federalizes a common law tort."); *20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 747 F.2d 81, 92 n. 15 (2d Cir.1984) ("[S]ection 43(a) created a new federal statutory tort."); *Ragold,*

*Inc. v. Ferrero, U.S.A., Inc.*, 506 F.Supp. 117, 120 (N.D.Ill.1980) ("Violations of section 43(a) of the Lanham Act constitute a tort of unfair competition." (citing *F.E.L. Publ'ns, Ltd. v. Nat'l Conference of Catholic Bishops*, 466 F.Supp. 1034, 1044 (N.D.Ill.1978))). Because this court cannot exercise pendent jurisdiction over tort claims, *see* 28 U.S.C. § 1491(a) ("jurisdiction to render judgment upon any claim ... for liquidated or unliquidated damages in cases not sounding in tort"); *American Renovation*, 65 Fed.Cl. at 260, it cannot rule on Liberty's allegation that governmental actions contravened the Lanham Act.

Second, Congress has specifically assigned jurisdiction over Lanham Act claims to the district courts. *See* 15 U.S.C. § 1121(a) ("The district and territorial courts of the United States shall have original jurisdiction ... of all actions arising under this chapter."). This statutory allocation of jurisdiction negates this court's pendent jurisdiction over such claims, just as similar language in the Federal Tort Claims Act negates this court's pendent jurisdiction over other tort claims. *See Strick*, 625 F.2d at 1010. In other words, the Lanham Act's specific grant of jurisdiction to the district courts trumps the general jurisdictional grant to this court under 28 U.S.C. §§ 1491 and 1498.

 Even when the court *can* exercise pendent jurisdiction over a claim, it must also consider whether it *should* do so. "Pendent jurisdiction ... is a doctrine of discretion, not of plaintiff's right, and is justified by considerations of judicial economy, convenience and fairness to litigants." *Watson v. United States*, 9 Cl.Ct. 763, 774 (1986) (citing *Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130); *see also Trek Leasing*, 62 Fed.Cl. at 678–79.

court); *Hall v. United States*, 69 Fed.Cl. 51, 57 (2005) (same). In the circumstances, the parties in this case have focused their arguments related to pendent jurisdiction on the doctrine as limned in *Gibbs* and as applied in *Trek Leasing* and other such cases. *Compare* Def.'s Mot. at 8–9, *and* Def.'s Reply at 7–9, *with* Pl.'s Opp'n at 22–24.

7. In *Owen Equipment*, the Supreme Court held that "a finding that federal and nonfederal claims arise from a 'common nucleus of operative fact,' the test of *Gibbs*, does not end the inquiry into whether a federal court has power to

hear the nonfederal claims along with the federal ones." 437 U.S. at 373. Instead, "minimum, there must be an examination of the posture in which the nonfederal claim is asserted and of the specific statute that confers jurisdiction over the federal claim, ... to determine whether 'Congress in [that statute] has ... expressly or by implication negated' the exercise of jurisdiction over the particular nonfederal claim." *Id.* (quoting *Aldinger*, 427 U.S. at 18, 96 S.Ct. 2413) (final two alterations in original).

 Liberty's state law claim, brought under the Florida Deceptive and Unfair Trade Practices Act, rests on a different footing than Liberty's Lanham Act claim.[8] Nevertheless, "considerations of judicial economy, convenience and fairness to litigants" weigh against exercising pendent jurisdiction over it. *See Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130. The unfair-competition claim, though closely linked to the Lanham Act, is distinct from Liberty's claims for patent infringement and breach of contract. This is not an instance where, as in *Trek Leasing*, "[t]he resolution of the state claim ... is inextricably linked to this [c]ourt's ability to grant relief under § 1498(b)." 62 Fed.Cl. at 679. In that case, the court could not decide the plaintiff's federal claim of copyright infringement without first deciding, under state law, whether the plaintiff actually owned the copyright. *Id.* at 677. Here, though Liberty's state law claims may be contingent on the outcome of its federal claims, the converse is not true.

Moreover, the state and federal claims do not overlap to such an extent that the court would resolve the former in the course of adjudicating the latter. To the contrary, "proof on the state law claim would require substantial additional evidence." *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 750 F.2d 947, 952 (Fed.Cir.1984). Moreover, the parties' briefing, arguments, and evidence on the unfair-competition claim will presumably be all for naught if the court finds that the government did not infringe Liberty's patent in developing the M855A1 EPR. Judicial economy would not be served by forcing parties to litigate an issue (whether the U.S. Army took credit for designing the green bullet) that may prove irrelevant (if the government proves that its green bullet does not infringe Liberty's patent or that Liberty's patent is invalid).

For these reasons, the court cannot exercise pendent jurisdiction over Liberty's claim under the Lanham Act and declines to exercise pendent jurisdiction over Liberty's Florida-law-based unfair-competition claim.

## CONCLUSION

The government's motion to dismiss Liberty's claims in Count II (the contract claims) is DENIED, but the government's motion to dismiss Count III (the Lanham Act and unfair-competition claims) is GRANTED.

The government shall file its answer on or before November 23, 2011.

It is so ORDERED.

---

8. The government contests jurisdiction over this claim on the grounds that "there has been no waiver of sovereign immunity for this state law claim." Def.'s Reply at 9. This contention challenges application of the *Gibbs* test for applying pendent jurisdiction, an argument which the court addresses in the analysis which follows.

The Florida statute basically is a consumer-protection law, *see* Fla. Stat. Ann. § 501.202, the application of which is specifically to be guided by "interpretations of the Federal Trade Commission and the federal courts relating to [§ ]5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. [§ ]45(a)(1) as of July 1, 2006." Fla. Stat. Ann. § 501.204(2). As a result, the statutory cause of action created by the Florida law has elements of a tort, although the parties have not argued this point, and the court therefore will not consider it.