ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Warfighter Defense Inc. | ) ASBCA No. 63924 |
| | ) |
| Under Contract No. SPE4A6-24-P-L702 | ) |

APPEARANCE FOR THE APPELLANT:   Mr. Andy Chavez
  Chief Executive Officer

APPEARANCES FOR THE GOVERNMENT:  Kelly L. Diaz-Abertini, Esq.
  DLA Acting Chief Trial Attorney
  Jaime A. Molbreak, Esq.
  Trial Attorney
  DLA Aviation
  Richmond, VA

OPINION BY ADMINISTRATIVE JUDGE WILSON
ON THE GOVERNMENT'S MOTION TO DISMISS
FOR LACK OF JURISDICTION AND FOR SUMMARY JUDGMENT

Appellant Warfighter Defense Inc. (Warfighter or appellant) appeals from a contracting officer's final decision denying its request to waive an inspection requirement appearing in a purchase order for special purpose electrical cable assemblies. The Defense Logistics Agency – Aviation (DLA or government) has moved to dismiss the appeal for lack of jurisdiction and for summary judgment, alleging that no contract ever existed between the parties. Warfighter argues that it "unequivocally" accepted DLA's purchase order, thereby forming a binding contract. For the reasons stated below, we deny the motion to dismiss for lack of jurisdiction and grant the motion for summary judgment.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. On February 7, 2024, DLA issued Request for Quotations (RFQ) No. SPE4A6-24-T-855T seeking special purchase electrical cable assemblies (hereinafter cables) (R4, tab 1 at 1, 7). The RFQ identified the assigned National Stock Number (NSN) for the cables as 5995-01-563-4678 and designated them a

critical application item (R4, tab 1 at 7; *see* gov't mot., Statement of Undisputed Material Facts ¶ 1 (hereinafter SUMF)).[1]

2. The RFQ indicated that FAR 52.246-2, INSPECTION OF SUPPLIES-FIXED PRICE (AUG 1996), applied. That clause gives the government the right to "inspect and test all supplies called for by the contract, to the extent practicable, at all places and times, including the period of manufacture, and in any event before acceptance." FAR 52.246-2(c). The RFQ also stated in several places that inspection at the point of origin would be required. (R4, tab 1 at 2, 6-7; gov't mot. at ex. 2, declaration of Debre R. Burks ¶ 3 (hereinafter Burks decl.); SUMF ¶ 1)

3. The RFQ incorporated by reference the terms and conditions set forth in the DLA Master Solicitation for Automated Simplified Acquisitions Revision 94 (December 1, 2023) (hereinafter 2023 Master Solicitation)[2] (R4, tab 1 at 1). Subpart A of that document set forth a list of mandatory FAR clauses applicable to all solicitations and orders and included FAR 52.246-2 (2023 Master Solicitation at 7-15). Subpart C set forth a list of "procurement notes" that would apply to solicitations and orders as indicated therein.[3] That list included Clause E06, INSPECTION AND ACCEPTANCE AT SOURCE (JUN 2018), which stated it would apply to solicitations and contracts requiring source inspection and acceptance. (*Id.* at 29, 31)

4. On February 17, 2024, Warfighter submitted its quote for the cables identifying itself as a dealer, with the manufacturer identified using a CAGE code of 1UXU8 (R4, tab 2 at 2). The quote did not identify the manufacturer by name, but that number is the CAGE code for CableWholesale.com (Cable Wholesale), located in Livermore, California (R4, tab 4 at 4, 6). Warfighter submitted its quote as a "Bid without Exception," confirmed the inspection point would be origin, and identified the place of inspection as Cable Wholesale, again using its CAGE code (R4, tab 2 at 1; SUMF ¶ 3). The dollar amount was $9,480.90 with the number of "delivery days" identified as 100 (R4, tab 2 at 1).

---

[1] In its opposition to DLA's motion, Warfighter did not include specific responses correlating to each of DLA's Statement of Undisputed Material Facts. It disputes many of them by implication but as described herein, did not identify any documents in the record or provide any new evidence to support its conflicting assertions.

[2] This document was not included in the Rule 4 file but it is publicly available at https://www.dla.mil/Portals/104/Documents/J7Acquisition/MasterSolicitation4ASAcqRev-94_December_1_2023.pdf.

[3] According to the 2023 Master Solicitation, the full text of the procurement notes could be accessed at http://www.dla.mil/HQ/Acquisition/Offers/eProcurement.aspx (*see* 2023 Master Solicitation at 29).

5. By email dated March 21, 2024, DLA directed Warfighter's CEO, Mr. Andy Chavez, to complete a questionnaire to substantiate Warfighter's quote. Because Warfighter submitted its quote as a dealer, DLA needed information providing traceability to the manufacturer including "[a] copy of the cited source's quote to your company. The quote should be on the source's letterhead or be identified to the source in some way." (R4, tab 5 at 2) Warfighter was also required to submit "[a] copy of the cited source's document that states that your company is an authorized dealer/distributor for the source. . . . [and] a point of contact at the source that can substantiate any of the above" (*id.*).

6. Mr. Chavez responded by email that evening, March 21, 2024, with a package of documents that included a copy of the quote from Cable Wholesale, on its letterhead, for the cables (R4, tab 5 at 1, 11). The package also included a revised quote dated March 21, 2024, with the number of "delivery days" identified as 60 (R4, tab 5 at 19-20). Like the prior quote, the revised quote indicated it was being submitted as a "Bid without Exception," confirmed the inspection point would be origin, and identified the place of inspection as Cable Wholesale (using its CAGE code). There was no change in the price. (*Id.* at 19; *see* SUMF ¶ 5) Aside from the quote itself, nothing in this email or its attachments referenced the RFQ's inspection requirement (R4, tab 5).

7. By email dated March 22, 2024, the contracting officer informed Mr. Chavez that his response contained no information regarding traceability to the manufacturer. Mr. Chavez disputed that claim, and the contracting officer subsequently conceded that it did. This exchange of emails contained no discussion of the RFQ's inspection requirement. (R4, tab 6 at 1-3)

8. Also on March 22, 2024, Mr. Chavez emailed what he described as a formal request to the contracting officer asking that she forward Warfighter's quote and supporting documentation to DLA's product specialist for the cables' NSN, or to the "Engineering Support Activity," for their review and approval. The stated purpose of this request was to "expedite the approval process and ensure transparency." (R4, tab 6 at 1) Mr. Chavez also requested that if Warfighter's quote were denied for any reason, DLA should provide a detailed explanation for the denial and that Warfighter "reserve[d] the right to pursue any denial of our . . . cabling quote to the next higher contracting authority" (*id.*). Mr. Chavez also stated that Warfighter "ensured our quote fully complies with all specified requirements" (*id.*; SUMF ¶ 7). Neither the email nor its attachments contained any reference to the RFQ's inspection requirement (R4, tab 6 at 1).

9. On March 27, 2024, due to the contracting officer's illness, supervisory contracting officer Ms. Debre Burks transferred the materials related to the RFQ to an

acquisition specialist under her supervision (R4, tab 7; SUMF ¶ 8; Burks decl. ¶ 2). Ms. Burks later became the contracting officer for this procurement (R4, tab 10).

10. By email dated April 15, 2024, the acquisition specialist asked Mr. Chavez whether Warfighter or Cable Wholesale would require access to any "c-folder data" from the government to perform the contemplated work. Mr. Chavez replied that afternoon, indicating that neither Warfighter nor Cable Wholesale required access to any data as the cables were "commercially readily available for immediate shipping/delivery to DLA depot." (R4, tab 8) Mr. Chavez also attached information from a government database showing that Cable Wholesale was a DLA designated supplier for the NSN identified in the RFQ (*id.*). Nothing in this exchange of emails referenced the RFQ's inspection requirement (*id.*).

11. On April 16, 2024, DLA issued firm fixed price purchase order number SPE4A6-24-P-L702 for 1,122 cables at a unit price of $8.45 and a total price of $9,480.90. The Defense Contract Management Agency (DCMA) office in San Diego was to administer the contract and delivery was to occur on June 17, 2024. (R4, tab 4 at 1, 4) The same NSN appearing in the RFQ appeared under Section B of the purchase order. Like the RFQ, the purchase order indicated the cables were a critical application item (R4, tab 1 at 7, tab 4 at 4; *see* SUMF ¶ 10).

12. The purchase order incorporated by reference FAR 52.246-2, INSPECTION OF SUPPLIES FIXED PRICE (AUG 1996) (R4, tab 4 at 6). It also included the full text of Clause E06, INSPECTION AND ACCEPTANCE AT SOURCE (JUN 2018), which required that inspection and acceptance take place at source. The clause further stated that "[t]he contractor shall indicate the location where supplies will be inspected, if different from the production location . . . ." (*Id.*) The clause then identified Cable Wholesale using its CAGE code and its Livermore, California address as the location for inspection (*id.*; *see* SUMF ¶ 10 (noting inspection was to take place at origin)).[4]

13. On the first page of the purchase order, Box 16 referenced Warfighter's February 7, 2024 quote[5] and included the following statement:

---

[4] The purchase order included a list of "DLA Aviation Notices" incorporated by reference; a Master Solicitation for Automated Simplified Acquisitions dated March 2017 appears on that list (R4, tab 4 at 2). A version dated March 3, 2017 appears at https://www.dla.mil/Acquisition/Archives. Like the 2023 Master Solicitation, the 2017 version lists FAR 52.246-2 as a mandatory clause and indicates that Clause E06 would apply to procurements requiring source inspection (2017 Master Solicitation at 4-5, 9).

[5] The reference to Warfighter's original February 7, 2024 quote appears to have been a clerical error. The February 7, 2024 quote set the number of days for delivery

ACCEPTANCE. THE CONTRACTOR HEREBY
ACCEPTS THE OFFER REPRESENTED BY THE
NUMBERED PURCHASE ORDER AS IT MAY
PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED,
SUBJECT TO ALL THE TERMS AND CONDITIONS
SET FORTH, AND AGREES TO PERFORM THE
SAME.

(R4, tab 4 at 1)

14. Box 16 also had space for the contractor's signature and signature date. Inside Box 16 was a smaller box stating "[i]f this box is marked, supplier must sign Acceptance." That smaller box was unmarked, and Box 16 did not contain a signature from a Warfighter representative or a date. (R4, tab 4 at 1; SUMF ¶ 10)

15. On April 19, 2024, Mr. Chavez submitted a post-award request (PAR) to DLA requesting "removal" (i.e., waiver) of the purchase order's inspection requirement (SUMF ¶ 11; gov't mot., ex. 11 at 1). [6] As described above, the contract incorporated FAR 52.246-2, INSPECTION OF SUPPLIES FIXED PRICE (AUG 1996), which gives the government the right to inspect the supplies "at all places and times," *see* FAR 52.246-2(c), as well as Clause E06, which provides that "inspection and acceptance are at source." (R4, tab 4 at 6)

16. In the April 19, 2024 PAR, Mr. Chavez stated that both he and Cable Wholesale believed "inspection . . . could potentially hinder the timely delivery of the . . . cables to DLA depots" (gov't mot., ex. 11 at 1; *see* SUMF ¶ 11). Mr. Chavez listed several reasons why inspection was unnecessary, including that the cables were a commercially available off-the-shelf (COTS) standard industry product available from numerous vendors. He further stated that Warfighter's quote "was based on the government-approved part number (CAGE Code 1UXU8 part number) listed in the NSN procurement history" (*id.*).

17. Mr. Chavez closed by offering to provide any additional "documentation or clarification" DLA required and stated that he "look[ed] forward to [DLA's] prompt response and a collaborative resolution to this matter" (*id.*; *see also* gov't mot., ex. 12 at 6-7 (email to DLA dated April 19, 2024 quoting PAR and requesting date for its resolution)).

---

at 100 but the March 21, 2024 quote set it at 60, which is the number of days appearing in the purchase order. (R4, tabs 2-3; *see* gov't mot. at 4 n.1).

[6] We have used the pdf page numbers for the government's exhibits to its motion as they were not paginated.

18. By email dated April 23, 2024, a DLA contract specialist advised Mr. Chavez that DLA could not waive the requirement that DCMA inspection take place at Cable Wholesale's facility. She stated that the place of inspection determination was based upon a combination of factors, including "the weapon system indicator code, essentiality code, AMC/AMSC, and others. . . . The place of inspection for this material must be at source IAW DLA standard operation procedures." (Gov't mot., ex. 12 at 5; *see* SUMF ¶ 12; *see also* Burks decl. ¶ 4 (describing factors affecting place of inspection determination))

19. By email dated May 24, 2024, Mr. Chavez submitted what he identified as a "formal notice of a claim" under the Contract Disputes Act (CDA). Mr. Chavez argued that despite Warfighter providing DLA with comprehensive information concerning the cables, DLA was now imposing a DCMA source inspection requirement. (R4, tab 9 at 1) Mr. Chavez characterized DLA's action as a material breach and "improper modification" that "fundamentally alter[ed] the nature of the contract, deviating significantly from the mutual understanding established during pre-award negotiations" (*id.*; *see* SUMF ¶ 14).

20. Mr. Chavez further contended that imposing the inspection requirement "contradicts the explicit representations made by our company regarding the commercial nature of the Cat 5 cables. . . . [T]hese cables are standard, commercially available items" and the inspection requirement "not only disregards this established commerciality but also imposes an undue burden on our company by necessitating additional resources, time, and expense that were not contemplated or accounted for in the original contract terms." (R4, tab 9 at 1-2) He alleged that the inspection process had already caused increased costs and "delays in the production and delivery schedule" (*id.* at 2; *see* SUMF ¶ 14). He further asserted that Warfighter had "incurred additional expenses related to personnel, logistics and administrative efforts to comply with this unexpected demand. Additionally, the inspection process itself has caused delays in the production and delivery schedule" which impacted Warfighter's ability to "meet other contractual obligations and [would] potentially lead[] to financial losses" (R4, tab 9 at 2; SUMF ¶ 14).

21. Mr. Chavez requested that the contracting officer issue a final decision on his claim. The relief he requested included an acknowledgement of the commercial item nature of the cables, recission of the DCMA source inspection requirement, and an equitable adjustment to the contract price and/or schedule "due to the improper imposition of this requirement" (*id.* at 2). Mr. Chavez closed by stating that Warfighter "remain[ed] committed to fulfilling our contractual obligations" (*id.*). He also "urge[d] DLA to reconsider its position and work collaboratively with us to resolve this dispute amicably" (*id.*).

6

22. The claim did not identify the nature of the additional expenses Mr. Chavez alleged Warfighter incurred and did not identify a dollar figure for those alleged additional expenses (R4, tab 9; SUMF ¶ 14). The record contains no evidence of any additional expenses, delays in performance, or impact on other contractual obligations allegedly caused by the inspection requirement.

23. On the morning of May 29, 2024, a DLA branch chief informally responded to Mr. Chavez's May 24, 2024 claim. She pointed out that the RFQ required inspection and acceptance at the place of origin and that Warfighter's quote agreed to that requirement. She then stated that if Warfighter was "not willing/able to comply with the terms of the contract, I can request a no cost cancellation and we will post this requirement out for rebid." (Gov't mot., ex. 12 at 2-3; *see* SUMF ¶ 15)

24. Mr. Chavez emailed the branch chief that same afternoon. He requested that DLA reconsider its position, arguing that because the cables were COTS items, Warfighter did not have access to any proprietary information:

> Standard DCMA inspection protocols typically necessitate access to the manufacturer's facility, where the requisite technical drawings and documentation are housed. In the present case, given the COTS nature of the item, a meaningful inspection would be rendered impracticable without the TDP from the aforementioned C folders. Our explicit communication regarding the lack of access to the C folders, coupled with the submission of the drawing from Cable Wholesale, led us to reasonably believe that a DCMA inspection waiver would be granted.
> This understanding is further bolstered by our extensive experience with DLA contracts. In numerous prior instances, DCMA inspections were appropriately waived for COTS items when the TDP was unavailable due to proprietary restrictions or other justifiable circumstances. We contend that the current inspection requirement is misaligned with the specific contractual context and the documented unavailability of the TDP. Mandating a DCMA inspection under these conditions would constitute an unproductive utilization of government resources and would not yield any meaningful assessment of the COTS item's compliance.

(Gov't mot., ex. 12 at 1-2)

25. Mr. Chavez closed by stating "[w]e remain steadfast in our commitment to fulfilling all contractual obligations and delivering the [cables] . . . [and] remain open to further dialogue in pursuit of an amicable resolution to this matter" (*id.* at 2). He also reiterated that in the event that Warfighter's "concerns remain unaddressed," Warfighter's "previously submitted . . . [CDA] claim . . . remains in effect as of today. In the absence of a mutually agreeable solution, we kindly request a formal COFD regarding our claim" so that Warfighter could "promptly initiate the necessary procedures for the ASBCA to docket and consider the matter." (*Id.*)

26. By letter dated June 5, 2024, Ms. Burks responded to Mr. Chavez with the requested final decision. She described his May 24, 2024 email as a request to modify the terms of the purchase order rather than a claim cognizable under the CDA. She explained that even though Mr. Chavez insisted that what she referred to as "origin inspection" was not necessary, a number of factors determine where inspection takes place, including the fact that the purchase order had higher level quality requirements and the NSN involved in this procurement was a critical application item. She also pointed out this NSN was "coded as requiring origin inspection and acceptance, which was made clear" in the RFQ and was a term which Warfighter agreed to in its quote. She then stated that "[t]o the extent that your request can be considered a claim for adjustment of the contract terms" under the CDA, it was denied. (R4, tab 10; *see* SUMF ¶ 16)

27. By email dated June 7, 2024, Warfighter appealed the contracting officer's final decision to the Board. Warfighter's email referred to the purchase order as "Contract No. SPE4A624PL702" and attached a copy of the contracting officer's June 5, 2024 final decision.

28. On June 12, 2024, Warfighter filed its complaint alleging it had been awarded Contract No. SPE4A6-24-P-L702, but after award DLA improperly imposed the source inspection requirement (compl. ¶¶ 1, 5). Warfighter sought a declaration from the Board that the cables are commercial items under the FAR and that the alleged imposition of the source inspection requirement was "unwarranted and unjustified" (*id.* ¶ 20.a). It also sought rescission of the source inspection requirement (*id.* ¶ 20.b), and an equitable adjustment to "fully compensate [Warfighter] for the direct and consequential damages incurred as a result of DLA's improper imposition of the DCMA inspection requirement" (*id.* ¶ 20.c). Warfighter described those alleged damages as including "the increased costs associated with the administrative efforts, as well as the financial losses stemming from this appeal" and stated that [t]he equitable adjustment should be calculated to make Appellant whole and restore it to the position it would have occupied had DLA not breached the Contract" (*id.*). The complaint did not provide any further information about the increased costs and financial losses Warfighter alleged it experienced. The complaint also did not identify

8

a dollar figure for the equitable adjustment Warfighter sought for DLA's alleged breach.

29. DLA moved to dismiss Warfighter's appeal for lack of jurisdiction and for summary judgment. Warfighter's opposition to DLA's motion embedded two emails between DLA and Mr. Chavez exchanged in July 2024, after Warfighter filed this appeal but before DLA filed its motion.

30. In the first email, dated July 3, 2024, the DLA branch chief asked Mr. Chavez whether a no cost cancellation of the purchase order would be acceptable. Mr. Chavez replied on July 5, 2024, stating he would not accept a no cost cancellation but was open to negotiating a settlement. (App. opp'n at 4)

31. In the second email, dated July 8, 2024, Ms. Burks informed Mr. Chavez that DLA's July 3, 2024 email had been sent in error, as the purchase order lapsed on June 17, 2024 (*id.* at 5). Mr. Chavez responded the same date, characterizing Ms. Burks' claim that the purchase order had lapsed as "inconsistent" with the earlier request for a no cost cancellation, which he believed "confirm[ed] the Contract's ongoing validity" (*id.* at 6). He also described the July 8, 2024 email as a "clear breach of contract and a blatant disregard for ongoing legal proceedings" before the ASBCA (*id.*). He accused DLA of breaching its duty of good faith and fair dealing and requested that it "cease and desist from any further actions that could prejudice the ongoing ASBCA proceedings or interfere with [Warfighter's] rights under the Contract" (*id.*).

32. The contracting officer, Ms. Burks states in her declaration that Warfighter never furnished the cables specified in the purchase order (Burks decl. ¶ 3). Warfighter has not contested this statement.

## DECISION

DLA argues that we do not possess jurisdiction to hear this appeal because no contract exists between the parties and Warfighter has not offered any proof of an active contract or any enforceable contract rights (gov't mot. at 8). Citing FAR 13.004(b), DLA argues that Warfighter could have indicated acceptance of DLA's offer by "furnishing the supplies on or before the delivery date or accepting the order as offered by return writing . . ." (gov't mot. at 8). Instead, Warfighter "expressed an intent not to comply with the terms" of the purchase order, which eventually lapsed, meaning there is no contract upon which to base the Board's jurisdiction (*id.*). DLA also asserts that because Warfighter has made "no offer of proof" an active contract exists, its request for a contracting officer's final decision does not constitute a "claim" and it does not meet the definition of a "contractor" under the CDA (*id.* (citing 41 U.S.C. §§ 7101(7), 7102(a))).

9

DLA also argues that it is entitled to summary judgment because Warfighter has not identified any material fact or evidence contradicting the terms of the purchase order (gov't mot. at 9-10). DLA claims that the "context [Warfighter] provides in the appeal is just wrong – it misstates the plain language of the RFQ and [Warfighter's] quotes, and misrepresents what was exchanged in correspondence with DLA's pre-award team" (gov't mot. at 10). DLA also points out that while identifying a sum certain in a contractor's claim is no longer a jurisdictional requirement, it is still "mandatory" under the FAR, and the claim's failure to state a sum certain means it is "deficient and must be dismissed" (gov't mot. at 12-13) (citing *ECC Int'l Constructors, LLC v. Sec'y of the Army*, 79 F.4th 1364, 1370 (Fed. Cir. 2023)).

Warfighter disputes DLA's contentions concerning the existence of a contract. Warfighter contends that it accepted DLA's purchase order by promptly acknowledging its receipt, by engaging in "good faith discussions" regarding the terms of performance to obtain "clarification and resolution of the dispute concerning the origin inspection requirement," and by undertaking "preparatory measures" for performance (app. opp'n at 2). Warfighter alleges that through these actions it "manifested its unqualified acceptance" of the purchase order, forming "a legally binding bilateral contract under the Uniform Commercial Code" (*id.*).

Warfighter further claims that the "post-award endeavor to impose a DCMA origin inspection requirement constituted a substantial and material alteration of the terms of the contract" and that the "original RFQ did not note or mandate[] a DCMA inspection anywhere within the solicitation details" (*id.* at 3). Warfighter alleges that DLA's justification for the purported change in terms is "unfounded and unpersuasive" as "DLA possessed the capability and the obligation to ascertain the criticality of the cables prior to issuance" of the purchase order (*id*). Warfighter also describes DLA's actions after it filed its appeal with the Board as demonstrating bad faith and an attempt to circumvent the Board's authority (*id.*). Warfighter seeks declaratory relief, monetary damages in an unspecified amount, and an equitable adjustment, the details of which are not described. Finally, Warfighter points out that as a service-disabled, veteran-owned small business, Warfighter is entitled to certain rights via statute, and dismissal of the appeal would not only deprive Warfighter of its right to a fair hearing and due process but also would be a manifest injustice (*id.* at 7).

## I.   *DLA's Motion to Dismiss for Lack of Jurisdiction*

Warfighter bears the burden of proving the Board's jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); *United Healthcare Partners, Inc.*, ASBCA No. 58123, 13 BCA ¶ 35,277 at 173,156. "We accept uncontroverted factual allegations as true for purposes of deciding motions to dismiss for lack of jurisdiction, and 'other facts underlying the jurisdictional allegations are subject to fact-finding' based upon our

review of the record." *US Pan American Sols, LLC*, ASBCA No. 63743, 24-1 BCA ¶ 38,588 at 187,579 (quoting *L-3 Commc'ns Integrated Sys., L.P.*, ASBCA Nos. 60713, 60716, 17-1 BCA ¶ 36,865 at 179,625 (citations omitted)).

Under the CDA, we possess jurisdiction to "decide any appeal from a decision of a contracting officer of the Department of Defense, the Department of the Army, the Department of the Navy, the Department of the Air Force, or the National Aeronautics and Space Administration relative to a contract made by that department or agency." 41 U.S.C. § 7105(e)(l)(A) (emphasis added).  However, to establish our jurisdiction Warfighter does not have to prove that a contract actually exists, which would be a decision on the merits.  *See Avue Techs. Corp. v. Sec'y of Health & Hum. Servs.*, 96 F.4th 1340, 1344 (Fed. Cir. 2024) (citing *Engage Learning*, 660 F.3d 1346, 1355 (Fed. Cir. 2011)); *Tele-Consultants, Inc.*, ASBCA No. 58129, 13 BCA ¶ 35,234 at 172,994.  Instead, for jurisdictional purposes our inquiry is limited to determining whether Warfighter has made a non-frivolous allegation that a contract exists between it and DLA.  *See Avue*, 96 F.4th at 1344-45.

The burden of meeting this standard is quite low.  *See Anis Avasta Constr. Co.*, ASBCA No. 61107, 17-1 BCA ¶ 36,838 at 179,517 n.2.  We have previously held in similar circumstances that appellants have satisfied their jurisdictional burden of showing a non-frivolous allegation of a contract.  *See Anis Avasta*, 17-1 BCA ¶ 36,838 at 179,517 n.2 (appellant met its burden by alleging in its complaint that it received contract award, a notice to proceed and direction to begin work); *R&R Sys. Sols. LLC*, ASBCA Nos. 61269, 61405, 19-1 BCA ¶ 37,269 at 181,358 (appellant met its burden when it "plainly and explicitly" asserted the existence of a contract in its two notices of appeal, providing a copy of the contract with the first notice of appeal and a copy of the contracting officer's final decision with the second); *Black Tiger Company*, ASBCA No. 59189, 16-1 BCA ¶ 36,423 at 177,570-71 (appellant met the burden because its notice of appeal included a contract number, an SF 1449 identifying appellant as contractor, and a purported invoice).  Here, Warfighter's June 7, 2024 notice of appeal asserted the existence of a contract, included a purported contract number, and attached a copy of the contracting officer's June 5, 2024 final decision. Its complaint alleged it had been awarded a contract by DLA and again referenced a purported contract number.  (SOF ¶¶ 27-28)  We therefore determine that Warfighter made a non-frivolous allegation of a contract and deny DLA's motion to dismiss Warfighter's appeal for lack of jurisdiction.

For the same reason, DLA is also mistaken when it argues that because Warfighter made "no offer of proof" that a contract exists, its request for a contracting officer's decision was not a "claim" and it does not meet the CDA's definition of a "contractor" (gov't mot. at 8 (citing 41 U.S.C. §§ 7101(7),7102(a))).  Again, DLA's argument ignores the fact that to establish jurisdiction, Warfighter does not have to show

11

that a contract exists.  It must only have made a non-frivolous assertion of a contract, *see Avue,* 96 F.4th at 1344-45, and the record shows that it did (SOF ¶¶ 27-28).


## II.   DLA's Motion For Summary Judgment

To prevail on a motion for summary judgment, the movant must establish that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).  In deciding a motion for summary judgment, we do not "weigh the evidence and determine the truth of the matter" but rather determine whether material facts are in dispute.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A fact is material if it could affect the outcome of the appeal.  *Id.* at 248.


Once the movant has met its burden of proof, the non-movant must identify specific facts and evidence showing there is a genuine issue for trial.  *Pave-Tech Inc.*, ASBCA No. 61879, 22-1 BCA ¶ 38,095 at 184,998 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  We review the evidence in the light most favorable to the non-movant, and if significant doubt over any factual issue is present, it must be resolved in favor of the non-movant.  *Mingus*, 812 F.2d at 1390-91.  The non-movant must show an "evidentiary conflict on the record; mere denials or conclusory statements are not sufficient" to defeat a motion for summary judgment.  *Id.*; *see Anis Avasta Constr. Co.*, ASBCA No. 61926, 20-1 BCA ¶ 37,743 at 183,164 ("bare assertions" are not sufficient).  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  If "the record taken as a whole could not lead a rational trier of fact to find for the [non-movant], there is no 'genuine issue for trial.'"  *Id*. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## III.  Summary Judgment Analysis

In deciding a motion for summary judgment, we determine materiality by examining "the applicable substantive law."  *Anis Avasta*, 20-1 BCA ¶ 37,743 at 183,164 (citing *Liberty Lobby*, 477 U.S. at 248).  The "applicable substantive law" in this appeal begins with FAR Part 13, which governs acquisitions (including purchase orders) where the dollar amount does not exceed the simplified acquisition threshold of $250,000.  FAR 13.000; FAR 13.302-1; *see* FAR 2.101 (definition of "simplified acquisition threshold").  Whereas here, the solicitation was an RFQ, the contractor's response is a quotation, which cannot be accepted to form a binding contract.  *See* FAR 13.004(a); *see also* FAR 2.101 (definitions of solicitation and offer).  Instead, the offer arises when the government responds to the quotation by

issuing a purchase order, and a contract only arises when the contractor accepts the offer. FAR 13.004(a); FAR 2.101 (definition of purchase order).

The government may request the contractor "indicate acceptance of an order by notification to the Government, preferably in writing . . . ." FAR 13.004(b). Alternatively, "the supplier may indicate acceptance by furnishing the [item] ordered or by proceeding with the work to the point where substantial performance has occurred." *Id.* Where the supplier engages in "substantial performance" in an effort to provide the item that is the subject of the purchase order, an option contract is created and the government's offer becomes irrevocable until the date specified for delivery. *Commwise, Inc. Joseph Wetzel d/b/a Avetel*, ASBCA No. 56580, 09-2 BCA ¶ 34,240 at 169,230. However, "[i]f complete performance in accordance with the offer's terms and conditions is not tendered, the 'offer' lapses by its own terms." *Comptech Corp.*, ASBCA No. 55526, 08-2 BCA ¶ 33,982 at 168,082 (citations omitted)).

*A. There are no genuine material facts in dispute concerning Warfighter's rejection of DLA's purchase order.*

The terms of the purchase order did not require Warfighter's signature, and in fact Warfighter did not sign it (SOF ¶¶ 13-14). If the record contained some other written communication in which Warfighter stated it accepted the purchase order *as issued*, we might come to a different conclusion. That is not the case here. In every communication between Warfighter and DLA after DLA issued the purchase order, Warfighter made it abundantly clear that waiver of the inspection requirement was a necessary condition of its acceptance.

The record shows that Warfighter requested waiver of the inspection requirement four times: in the PAR, the email of the same date repeating the PAR's request and a timeline for its resolution, the claim, and in its request that DLA reconsider its position after its initial response to Warfighter's claim (SOF ¶¶ 15-17, 19-21, 24-25). Each time, Warfighter insisted that the inspection requirement was unnecessary, giving a plethora of reasons for that contention. None of these communications – all of which Warfighter submitted to DLA *after* DLA issued the purchase order – contain any language indicating acceptance. Instead, they demonstrate exactly the opposite.[7]

Rather than showing acceptance, Warfighter's post-purchase order communications with DLA constituted a rejection and counter-offer:

---

[7] The presence of conciliatory language in the closing paragraphs of these documents does not change our conclusion. The tenor of these repeated communications is clear and consistent. Mr. Chavez was demanding waiver of the inspection requirement. (SOF ¶¶ 15-17, 19-21, 24-25)

13

> A conditional acceptance is, in effect, a statement that the offeree is willing to enter into a bargain differing in some respect from that proposed in the original offer. The conditional acceptance is, therefore, itself a counteroffer [that] operates to reject the original offer, so that thereafter even a purportedly unqualified acceptance of that offer will not form a contract.

2 WILLISTON ON CONTRACTS § 6:13 (4th ed.); *see* RESTATEMENT (SECOND) OF CONTRACTS § 59, comment a (1981) ("A qualified or conditional acceptance proposes an exchange different from that proposed by the original offeror. Such a proposal is a counter-offer and ordinarily terminates the power of acceptance of the original offeree."); *id.* § 61, comment a (acceptance must be unequivocal and a contract is not created "if fairly interpreted, the offeree's assent depends on the offeror's further acquiescence in the modification."). This rule of law is well settled at the Federal Circuit and this Board. *See First Com. Corp. v. United States*, 335 F.3d 1373, 1381 (Fed. Cir. 2003) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 59 (1979) to define "counter-offer"); *Herman JCG Co. JV 1*, ASBCA No. 63235, 24-1 BCA ¶ 38,587 at 187,574-75 (citing *First Com. Corp.* for the definition of "counter-offer"); *Pro. Mgmt. Consulting Servs.*, LLC, ASBCA Nos. 61861, 62173, 20-1 BCA ¶ 37,638 at 182,747) (citing *First Com. Corp.*). *See also Cooper/Ports Am., LLC v. Sec'y of Def.*, 959 F.3d 1373, 1377 (Fed. Cir. 2020) (in the context of an option, noting that "acceptance . . . to be effectual, must be unqualified, absolute, unconditional, unequivocal, unambiguous, positive, without reservation, and according to the terms or conditions of the option.") (quoting *Holly Corp.*, ASBCA No. 24975, 83-1 BCA ¶ 16,327 at 81,165).

Notably, Warfighter never disputes the authenticity or legitimacy of the documents in the record. Instead, it describes the parties' communications in a manner that is at odds with what they show. [8] Warfighter first alleges that it "unequivocally" accepted DLA's purchase order by "acknowledg[ing] receipt" of the purchase order and then engaging in "good faith discussions" to obtain "clarification and resolution of the [inspection requirement] dispute" (app. opp'n at 2). Warfighter did not identify any document in the record where such acknowledgement occurred and provided no new evidence to support these assertions. Warfighter also did not explain how mere acknowledgement shows an "intent to fulfill [Warfighter's] contractual obligations" (app. opp'n at 2) and cited no case law to support that claim. With respect to the

---

[8] Warfighter also describes the RFQ and its quotations in a manner at odds with their contents. A plain reading of the RFQ shows that it contained an inspection requirement. Warfighter's responsive quotations to the RFQ were made as "Bids without Exception," confirmed the inspection point would be origin, and identified the inspection point as Cable Wholesale's facility. (SOF ¶¶ 2-4, 6)

purported "good faith discussions," the record shows that the subject of the inspection requirement did not even arise until *after* DLA issued the purchase order, and we have already determined that those communications constituted a clear rejection and counter-offer.

Warfighter also alleges that "[t]he subsequent dispute regarding the origin inspection requirement does not retroactively invalidate the contract's existence, as it pertains to a matter of performance rather than formation" (app. opp'n at 2). That distinction is irrelevant where again, the record demonstrates that Warfighter rejected the purchase order, thus terminating its power of acceptance. Indeed, Warfighter's assertion is belied by the language it uses in this sentence. Warfighter's admission of a "subsequent dispute" between it and DLA is contrary to the notion of acceptance.

From the start, DLA informed Warfighter that it would not waive the inspection requirement. DLA did not waver from that position, culminating in the contracting officer's decision that led to this appeal. (SOF ¶¶ 18, 23, 26) "If a request for additional or changed terms is fairly to be understood as *requiring the offeror's assent*, it will operate as a counteroffer and hence a rejection." 2 WILLISTON ON CONTRACTS § 6:13 (4th ed.) (emphasis added). *See also Comptech Corp.*, 08-2 BCA ¶ 33,982 at 168,083 ("To create a binding 'purchase' contract, an offeree's actions of acceptance cannot deviate from the terms of the 'offer.'") (citations omitted). Warfighter's pursuit of this waiver in the face of DLA's repeated denials unequivocally communicated to DLA that it considered the purchase order as written unacceptable.

We also note that in one of Warfighter's communications with DLA, Warfighter stated that "[i]n numerous prior instances, DCMA inspections were appropriately waived" for commercial off the shelf items in circumstances allegedly similar to those here "or other justifiable circumstances" (SOF ¶ 24).[9] Warfighter further stated that this fact, along with the pre-award email communications with DLA "led us to reasonably believe that a DCMA inspection waiver would be granted" (*id.*). This admission – that despite the presence of an inspection requirement in the RFQs, and Warfighter's agreement thereto in both of its quotations (SOF ¶¶ 3-5, 7), Warfighter believed inspection would not be required – conclusively demonstrates that the parties were never on the same page.

The record establishes that there are no material facts in dispute concerning Warfighter's rejection of the purchase order. The same is true with respect to whether DLA ever accepted Warfighter's counter-offer – it did not. (SOF ¶¶ 15-21, 23-26) Warfighter's bare assertions arguing otherwise do not constitute material facts in

---

[9] Warfighter produced no evidence that any such waivers ever occurred.

dispute and do not defeat DLA's motion for summary judgment. *See Mingus*, 812 F.2d at 1390-91; *Anis Avasta*, 20-1 BCA ¶ 37,743 at 183,164.

B. *There are no genuine material facts in dispute concerning Warfighter's failure to furnish the cables or substantially perform as contemplated by the purchase order.*

Under FAR Part 13, a contractor "may indicate acceptance by furnishing the [item] ordered or by proceeding with the work to the point where substantial performance has occurred." FAR 13.004(b). Substantial performance creates a unilateral option contract that is irrevocable up until the date specified for delivery. *Commwise, Inc.*, 09-2 BCA ¶ 34,240 at 169,230. "If complete performance in accordance with the offer's terms and conditions is not tendered, the 'offer' lapses by its own terms." *Comptech Corp.*, 08-2 BCA ¶ 33,982 at 168,082 (citations omitted)).

The record demonstrates that Warfighter never supplied DLA with the cables called for by the purchase order (SOF ¶ 31-32). Contrary to its assertion in its opposition, there is also no evidence that Warfighter undertook any "preparatory measures" that could be considered substantial performance, which would have had to occur prior to the purchase order's delivery date (SOF ¶¶ 20, 22, 28; *see* app. opp'n at 2).

In its claim and complaint, Warfighter alleged that delays, increased expenses, and impact upon other contracts as a result of the inspection requirement (SOF ¶¶ 20, 22, 28). In its opposition, Warfighter alleges that the inspection requirement interfered with its ability to "immediately commence" its performance (app. opp'n at 3). The logical inference of these alleged harms is that they could not have occurred in the absence of at least *some* degree of performance. Beyond these bare allegations, however, Warfighter provided no evidence to substantiate these alleged events. Indeed, Warfighter provided no evidence that any performance occurred at all, much less substantial performance. (SOF ¶¶ 20, 22, 28)

There are no material facts in dispute concerning Warfighter's failure to furnish the cables or substantially perform under the purchase order by its delivery deadline of June 17, 2024. Thus, there are no material facts in dispute concerning the purchase order's lapse. *Comptech Corp.*, 08-2 BCA ¶ 33,982 at 168,082; *see* RESTATEMENT (SECOND) OF CONTRACTS § 36(1)(a)-(b) (1981) (noting lapse as a means by which the power of acceptance may be terminated).

To the extent that Warfighter believes the branch chief's July 3, 2024 email concerning a no cost cancellation somehow revived the purchase order, it is incorrect (*see* app. opp'n at 4-5) (describing contents of the July 3 and 8, 2024 emails as "inconsistent")). Nothing in the July 3, 2024 email encouraged continuing performance; instead, it suggested exactly the opposite. The July 8, 2024 email made clear the July 3, 2024 email had been sent in error, as the purchase order had already

16

lapsed. (SOF ¶¶ 30-31) In addition, even if the purchase order had been revived, Warfighter was still obliged to supply the cables within a reasonable time. *See Rex Sys., Inc.*, ASBCA No. 45301, 93-3 BCA ¶ 26,065 at 129,564) (where government took action deemed to have revived purchase order after appellant failed to meet delivery date, appellant was entitled to complete performance "within a reasonable time"). It did not. (SOF ¶ 32)

Warfighter has not identified any evidence showing that a genuine factual dispute exists concerning its failure to accept DLA's purchase order, either in writing or through full or substantial performance. *See Liberty Lobby*, 477 U.S. at 248-49. Thus, there are no material facts in dispute concerning the lack of a binding contract under FAR 13.004. Because "the record taken as a whole could not lead a rational trier of fact" to find in Warfighter's favor, there is no genuine issue for trial. *See Matsushita*, 475 U.S. at 587. DLA is therefore entitled to judgment as a matter of law.

## CONCLUSION

We have considered Warfighter's other arguments but do not find them persuasive. We deny DLA's motion to dismiss for lack of jurisdiction and grant its motion for summary judgment. The appeal is denied.

Dated: July 16, 2025

OWEN C. WILSON
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

LAURA J. ARNETT
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63924, Appeal of Warfighter Defense Inc., rendered in conformance with the Board's Charter.

Dated: July 16, 2025

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

18